1  BLAINE GREENBERG – State Bar No. 105719
2  Email: blaine@sslm.com
   3400 Red Rose Drive
3  Encino, CA  91436
   Telephone:  818.986.8433
4  Fax: 818.986.8435

5

6  Attorneys for Plaintiffs the Richard
   Dawkins Foundation for Reason and
7  Science and Richard Dawkins

8

9              UNITED STATES DISTRICT COURT

10        CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

11

12 | THE RICHARD DAWKINS                | CASE NO.  CV10 8400-JFW (FFMx)
13 | FOUNDATION FOR REASON AND          |
   | SCIENCE, a Delaware Charitable     | **FIRST AMENDED COMPLAINT FOR:**
14 | Corporation, and CLINTON RICHARD   |
15 | DAWKINS (commonly known as         | **BREACH OF ORAL CONTRACT;**
   | RICHARD DAWKINS), an individual,   |
16 |                                    | **BREACH OF THE IMPLIED COVENANT**
17 |      Plaintiffs,                   | **OF GOOD FAITH AND FAIR DEALING;**
18 |           v.                       | **BREACH OF FIDUCIARY DUTY;**
19 | JOSH TIMONEN, an individual,       | **FRAUD;**
20 | MAUREEN NORTON, an individual,     |
   | UPPER BRANCH PRODUCTIONS,          | **EMBEZZLEMENT; and**
21 | INC., a California Corporation, and|
22 | DOES 1-50,                         | **INTERFERENCE WITH PROSPECTIVE**
   |                                    | **ECONOMIC ADVANTAGE.**
23 |      Defendants.                   |
24 |                                    | **DEMAND FOR JURY TRIAL**

25

26 Plaintiffs allege:

27 / / /

28 / / /

FIRST AMENDED COMPLAINT

## THE PARTIES

1.  Plaintiff Richard Dawkins Foundation for Reason and Science ("RDFRS" or the "US Foundation") is, and at all material times was, a private 501(c)(3) charitable corporation incorporated in the State of Delaware. RDFRS's stated mission "is to support scientific education, critical thinking and evidence-based understanding of the natural world in the quest to overcome religious fundamentalism, superstition, intolerance and human suffering."  At various times relevant to the facts alleged in this Complaint, the Executive Director of RDFRS has been Robin Cornwell, PhD, and its Trustees have included Richard Dawkins, DPhil, J. Anderson Thomson, Jr., M.D., Claire Enders, Todd Stiefel and Greg Langer, Esq.

2.  Plaintiff Clinton Richard Dawkins (commonly known as Richard Dawkins) is, and at all material times was, an individual residing in Oxford, England.  Professor Dawkins is an internationally renowned evolutionary biologist, university professor, lecturer, award winning intellectual and best-selling author, and perhaps the world's best known and most respected atheist.  Professor Dawkins is the founder of the US Foundation as well as its United Kingdom sister organization the Richard Dawkins Foundation for Reason and Science, Ltd. (the "UK Foundation").  The UK Foundation has the same charitable, political and educational goals as the US Foundation and is a "Registered Charity" in Great Britain.

3.  Defendants Josh Timonen ("Timonen") and Maureen Norton ("Norton") are, and at all material times were, individuals working and residing in the County of Los Angeles, State of California.

4.  Defendant Upper Branch Productions, Inc. ("UBP") is, and at all material times was, a California Corporation with its principal place of business located in the County of Los Angeles, State of California.  Plaintiffs are informed and believe and therefore allege that UBP is wholly owned and

1   controlled by Defendant Timonen.

2       5.  The true names and/or capacities, whether individual, corporate,

3   associate or otherwise, of defendants named herein as Does 1 through 50,

4   inclusive, are unknown to Plaintiffs at this time.  Plaintiffs therefore sue

5   these Defendants, and each of them, by such fictitious names.  Plaintiffs will

6   seek leave of this Court to amend this Complaint to show their true names

7   and capacities when they have been ascertained.  Plaintiffs are informed

8   and believe and therefore allege that each of these fictitiously named

9   Defendants is legally responsible in some manner for the acts and/or

10   omissions referred to in this Complaint, and that Plaintiffs' damages were

11   and are caused by the conduct of the fictitiously named Defendants.

12   Timonen, Norton, UBP and Does 1 through 50, inclusive, will be referred to

13   collectively as "Defendants."

14       6.  Plaintiffs are informed and believe and therefore allege that, at all

15   times material hereto, each of the Defendants was the employer or

16   employee, joint venturer, partner, agent, principal, and/or co-conspirator

17   of each of the remaining Defendants, and in doing each and all of the things

18   alleged herein, was acting within the scope and purpose of his, her or its

19   authority as such employer, employee, joint venturer, partner, agent,

20   principal and/or co-conspirator with the permission, consent and ratification

21   of each of the remaining Defendants.

22

23       **ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

24   **Timonen's Contractual Relationship With RDFRS and Professor Dawkins**

25       7.  In or around 2006, Timonen, who was then 24 or 25 years old,

26   began doing work "benefit[t]ing [Richard Dawkins] personally."  This work

27   included video production and website design and maintenance.  Over time

28   Timonen's efforts for Professor Dawkins expanded to encompass video

production, website design and maintenance and assorted other activities for RDFRS as well.

8.   According to Timonen's own records and written admissions, Richard Dawkins paid him the following sums for his personal services: $20,000 in November 2006, $20,000 in May 2007, $20,000 in February 2008 and $25,000 in January 2009.  Richard Dawkins also paid Timonen an additional $25,000 in early 2010 to cover all of Timonen's services to be provided to Professor Dawkins personally for all of calendar year 2010.  In total, Richard Dawkins has paid Timonen $130,000 for personal services.

9.   According to Timonen's own records and written admissions, RDFRS has paid him the following sums for his personal services: $5,000 per month from February 2008 through October 2009 (a total of $105,000) and $2,885 every 2 weeks – an annualized rate of $75,000 – from November 2009 through May 2010 (a total of $43,750).  In all, RDFRS paid Timonen $148,750 for slightly more than two years of work.

10.   Altogether, Timonen received $278,750 of compensation directly from Richard Dawkins and RDFRS over approximately 3.5 years (an average of nearly $80,000 per year).  Plaintiffs are informed and believe and therefore allege that this rate of annual compensation was exceedingly generous and well above-market for someone of Timonen's age and experience, particularly for someone providing the bulk of his efforts to a charitable organization.

11.   Plaintiffs and Timonen agreed at all times that Timonen was acting as an independent contractor for them and would be personally responsible for covering his own health insurance needs and state and federal taxes.  He was, at all times, provided Form 1099's and otherwise properly treated as an independent contractor.

12.   Timonen represented to Plaintiffs that, as of 2007 at the latest, he

was providing virtually all of his work efforts to the projects they were paying him to accomplish.  RDFRS paid Timonen for his services on a regular schedule (monthly at first and every two weeks later on).  Richard Dawkins paid Timonen for his services, in advance, through periodic advances of substantial lump sums to cover extended periods of time.  As alleged above, the $25,000 lump sum payment Professor Dawkins made to Timonen in early 2010 was for services Timonen was to render throughout the entire calendar year.

13.  On or about May 22, 2010, Timonen notified Plaintiffs he was ceasing all work for them.

14.  Despite repeated oral and written demands, Timonen has failed and refused to repay to Richard Dawkins the unearned (7/12$^{ths}$) portion of the $25,000 lump sum payment Professor Dawkins paid him for work throughout 2010.  Consequently, Timonen presently owes Richard Dawkins $14,583.33.

**Norton's Relationship to Timonen and RDFRS**

15.  Plaintiffs are informed and believe and therefore allege that Defendants Norton and Timonen are cohabiting and have been, at all material times, romantically involved with one another.  Norton is older than Timonen and has young adult children.

16.  Norton is a "post-production supervisor" and has worked in that capacity consistently since at least 1997.  Norton has never been in contractual privity with Plaintiffs and Plaintiffs have never hired her to do any work on their behalf or account.  Norton has, nonetheless, assisted Timonen in some of his responsibilities to RDFRS, purportedly as a "volunteer."  She also volunteered to assist with the Menlo Park, California fund-raising event discussed below.

///

"Growing Up In The Universe"

17. The Royal Institution Christmas Lectures for Children were founded by Michael Faraday in 1825. (Michael Farady was a famous English chemist and physicist, perhaps best remembered as the inventor of the electric motor.) In 1991, Richard Dawkins was honored to be invited to deliver The Royal Institution Christmas Lectures for Children. His series of five one-hour lectures "on life, the universe, and our place in it" were filmed and first broadcast by the BBC in that year (the "Dawkins Lectures"). The BBC called the Dawkins Lectures "Growing Up in the Universe."

18. In 2006, Richard Dawkins, in conjunction with the British Humanist Association, decided to introduce "Growing Up in the Universe" to British school children and others who had not had the opportunity to see the Dawkins Lectures 15 years earlier. Richard Dawkins and the UK Foundation donated funds to produce a written curriculum to accompany a DVD of the Dawkins Lectures. In addition, in July 2006, Richard Dawkins personally paid to acquire the copyrights to all five Dawkins Lectures from the copyright holder.

19. In March 2007, Richard Dawkins paid for the preparation of artwork and packaging as well as the manufacture of 6,000 2-DVD packages of "Growing Up in the Universe." Richard Dawkins contributed his copyrights in the Dawkins Lectures and all the "Growing Up in the Universe" product, artwork and packaging he had paid for to RDFRS, with the express intent of devoting the profits from the DVD sales to the continued benefit and operation of the US Foundation. Hyperlinks to the British company selling "Growing Up in the Universe" DVDs (Burning Shed/Noisebox) were placed on the websites for the US Foundation and the UK Foundation.

20. Timonen designed these websites for the US and UK Foundations and both websites were replete with representations – first posted online on

April 1, 2007 – assuring the public that purchasers of "Growing Up in the Universe" would be benefitting RDFRS.  These statements, authored by Timonen, included "BUY THE DVD NOW (All proceeds go to RDF)," "BUY THE DVD through our online store (All proceeds go to RDF)" and "All proceeds from the sale of this DVD are donated to The Richard Dawkins Foundation for Reason and Science."  Plaintiffs are informed and believe and therefore allege that Defendants caused these representations to remain on the US and UK Foundation websites continually from April 1, 2007 until at least May 22, 2010 (when Timonen notified Plaintiffs he was ceasing work for them).

**The Creation and Operation of "The Store"**

21.  In 2007, RDFRS and Timonen agreed it would be a good idea to create an online store ("The Store") to help market the "Growing Up in the Universe" DVDs, other audio-visual products, T-shirts, caps, mugs, pins and other merchandise related to RDFRS's mission and charitable goals.

22.  At the time, RDFRS's Trustees believed that legal requirements (particularly controls imposed on Richard Dawkins and the UK Foundation by the British Charities Commission) made it legally impermissible for The Store to be owned by RDFRS.  This information was shared with Timonen and he agreed to use his personal corporation UBP to operate The Store for RDFRS's benefit.

23.  Plaintiffs and Timonen agreed that (i) Plaintiffs would fund the creation and operation of The Store (primarily with seed money generated by the sale of "Growing Up in the Universe" DVDs), (ii) The Store would operate as a component of RDFRS's website (from a virtual, online perspective), (iii) all proceeds from the operation of The Store belonged to RDFRS and would be remitted by UBP to RDFRS when earned, (iv) UBP would be operated honestly and appropriately according to generally accepted accounting principles and applicable Federal and State laws, (v) Timonen

was already being adequately compensated and would not receive additional compensation for operating The Store or developing any of the merchandise or marketing materials it used and (vi) any copyrights, trademarks, logos or other intellectual property developed for or marketed through The Store (the "IP") and any inventory of Store merchandise would be assigned to RDFRS.

24.  Plaintiffs are informed and believe and therefore allege that 100% of the assets and income of UBP from 2007 through May 2010 came from the sale of merchandise beneficially owned by RDFRS and advertised on its website.

25.  During UBP's operation of The Store, Defendants repeatedly represented to Plaintiffs that Norton was spending a great deal of uncompensated time on Store business to benefit RDFRS.  Defendants further represented that Norton was suffering financially because she could not devote full-time efforts to her work as a post-production supervisor in the film industry.   (These representations included those made by both Timonen and Norton to J. Anderson Thompson, Jr. in Los Angeles, California in the summer of 2008; to J. Anderson Thompson, Jr. in Los Angeles, California in the summer of 2009 (while he was spending several days with Timonen and Norton in connection with the filming of Dr. Thompson's interview of Nate Phelps); to Professor Dawkins and Dr. Thompson in Menlo Park, California during a fund raising event in October 2009; and to Robin Cornwell and RDFRS's legal counsel (Steve Gaines, Esq. and Jill Chambers, Esq.) during an extensive meeting on March 3, 2010; and to Robin Cornwell in numerous telephone calls and face-to-face discussions throughout 2009 and 2010.) Indeed, the Trustees of RDFRS were so impressed with Norton's supposed "volunteer" efforts and so sympathetic to her purported fiscal plight that they authorized a payment to her of $10,000 as thanks for her efforts in

connection with an RDFRS fund-raising event held in Menlo Park, California in 2009.

26.  Both before and after the incorporation of UBS, Plaintiffs provided money and/or credit to Defendants for equipment, services, rent and other items needed to help (i) Defendants operate The Store and (ii) Timonen perform his contractual services to Professor Dawkins and RDFRS.

27.  UBP made a single $30,000 payment from The Store to RDFRS in January 2008.  With that one exception, Defendants have not remitted anything from UBP's operation of The Store to Plaintiffs.  Moreover, Defendants repeatedly represented to RDFRS's Trustees and its Executive Director that The Store was barely self-supporting or, later on, finally just starting to operate at a small profit.  (These representations included those made by both Timonen and Norton to J. Anderson Thompson, Jr. in Los Angeles, California in the summer of 2008; to J. Anderson Thompson, Jr. in Los Angeles, California in the summer of 2009 (while he was spending several days with Timonen and Norton in connection with the filming of Dr. Thompson's interview of Nate Phelps); to Professor Dawkins and Dr. Thompson in Menlo Park, California during a fund raising event in October 2009; and to Robin Cornwell and RDFRS's legal counsel (Steve Gaines, Esq. and Jill Chambers, Esq.) during an extensive meeting on March 3, 2010; and to Robin Cornwell in numerous telephone calls and face-to-face discussions throughout 2009 and 2010.)

28.  During all the years Defendants operated The Store through UBP, they never provided Plaintiffs financial records, general ledgers, revenue statements, profit and loss statements or any other accounting of the activities they were engaged in for the supposed benefit of RDFRS. Defendants knowingly concealed from Plaintiffs the fact that The Store was actually generating hundreds of thousands of dollars in revenue, most of

which Defendants were misappropriating for themselves and Norton's family members.  In fact, Timonen authored express representations he caused to be included on the websites for the US and UK Foundations which hosted The Store including this one: "Purchases directly from the Store or via Amazon links found on this website directly benefit the Richard Dawkins [F]oundation and [*sic*] we appreciate your ongoing support."

**Plaintiffs' Discovery of Defendants' Fraudulent and Criminal Conduct**

29.  By early Summer, 2010, the legal impediments that had prevented RDFRS from operating The Store itself were eliminated and the Executive Director and Trustees decided to transfer The Store's operations from UBP to RDFRS.  In connection with this decision, RDFRS had a number of meetings with Timonen and Norton and requested access to the financial books and records of UBP.  Norton and Timonen complied with this request, at least in part, and delivered QuickBooks files for UBP to Dr. Cornwell in or about June 2010.

30.  Plaintiffs' review of the financial records Defendants provided resulted in their discovery of a plethora of shocking financial improprieties Defendants had perpetrated over the years.  For example:

        a.     Defendants charged tens of thousands of dollars of unnecessary and unauthorized expenses against the proceeds from the Store (which belonged to RDFRS).  These included a $201.50 charge at Whole Foods in Las Vegas, $248.95 at Katsuya in Hollywood, $498.97 for a meal at Michael Mina's XIV in Hollywood, $202.15 at L'Atelier de Joel at the MGM Grand hotel, charges at an Arizona shoe store, bills from Timberline Lodge in Oregon and the Malibu Beach Inn, as well as a weight reduction program (or weight loss meals) purchased from Freshology, Inc.

    b.    Defendants used $27,826.50 of RDFRS's money to pay for health insurance from Blue Cross/Blue Shield.  As alleged above, it was always Timonen's obligation to provide his own health insurance and Plaintiffs never agreed to fund health insurance for Norton or anyone else from the revenues generated by The Store.

    c.    Defendants used RDFRS's money (generated by The Store) to pay "salaries" of at least $43,000 to Timonen and $168,509.08 to Norton – including an astonishing $73,941.18 in 2009 alone.

    d.    Defendants paid another $103,000 to "CSL" (much of it denominated "officer salaries" or "wages" in UBP's QuickBooks records).  Plaintiffs are informed and believe and therefore allege that Timonen and Norton either received these "CSL" funds directly, or personally benefitted from them.

    e.    Defendants paid an additional $29,045 to Graham Norton (Maureen Norton's teenage son), $300 to "Michelle Norton," $350 to "Brittany Norton," $1,102.75 to Ohana Farms (a business Plaintiffs believe to be owned by Maureen Norton's parents) and $64.90 to "Pondbiz."

31.  In summary, over approximately 3.5 years of operating The Store, Defendants consumed or expended at <u>least</u> $375,000 of the profits generated to personally benefit themselves and their relatives.  Meanwhile, they "contributed" only $30,000 from The Store's net receipts to RDFRS.  Put another way, <u>Defendants kept at least 92% of proceeds from The Store themselves and remitted less than 8% to RDFRS</u>.  And, <u>from February 2008 through May 2010, Defendants kept 100% of the proceeds from The Store for</u>

themselves!  When Plaintiffs requested additional financial documents and explanations of some of the UBP QuickBooks entries, Defendants refused to comply.

32.   If RDFRS's Executive Director and Trustees had known that Defendants were pillaging The Store to the tune of more than $100,000 a year on average, while representing it was just squeaking by, they would have terminated Defendants' authority to run The Store on behalf of RDFRS immediately.  Moreover, as fiduciaries of a tax exempt charitable enterprise, the Executive Director and Trustees would never have permitted any individual or entity to consume such a massive portion of The Store's net receipts.

**Defendants' (Disputed) Claims To Ownership of RDFRS's Intellectual Property**

33.  On July 15, 2010, Defendants' lawyer, Alan Abrams, Esq., sent an email to Plaintiffs' litigation counsel suggesting that "the RDF website (which . . . was created by Mr. Timonen) . . ., merchandise using the RDF logo created by Mr. Timonen, and audio-visual and musical materials created and produced by Mr. Timonen" are all "Mr. Timonen's intellectual property rights" which have not been transferred or assigned to RDFRS or Professor Dawkins.

34.  However, Defendant Timonen agreed when he first started doing any work for the Foundation that all IP he created for Plaintiffs at all times and for any purpose would belong to RDFRS.

35.  Plaintiffs are informed and believe that the only two items of IP Defendants have filed copyright registrations for are "Atheist Alliance International (AAI) 2007" (Registration Number PA 1-609-844) and "Pat Condell Anthology Feb. 2007 - Feb. 2008" (Registration Number PA 1-646-005).  Both of these registration statements were certified by Defendant

Timonen, named Defendant UBP as the "Copyright Claimant" and claimed the registered material was "work made for hire."  Both of these DVD titles were offered for sale and sold by Defendants solely through The Store on RDFRS's website.  And, consistent with their contractual agreements and obligations, Defendants UPB and Timonen transferred "all right . . . title, and interest, throughout the world, including any copyrights and renewals or extensions thereto" in the AAI 2007 and Pat Condell copyrights to RDFRS in two separate Assignments of Copyright each dated June 4, 2010.  Defendants also caused other products they prepared and sold through The Store to include copyright notices in the name of RDFRS, e.g., "Break The Science Barrier" which bears the notice "©2009 Richard Dawkins Foundation.  All Rights Reserved."

36.  Even with respect to items of IP for which Defendants did not sign "work for hire" contracts or assignments of copyright, Plaintiffs have permanent nonexclusive licenses to use and commercially exploit these "intellectual property" rights for the benefit of RDFRS, by virtue of the parties' conduct and operation of law.  See, e.g., *Atkins v. Fischer,* 331 F.2d 988 (D.C. Cir. 2003); *Nelson-Salabes, Inc. v. Morningside Development, LLC,* 284 F.3d 505, 514 (4th Cir.2002); *Johnson v. Jones*, 149 F.3d 494, 500 (6th Cir.1998); *Lulirama Ltd., Inc. v. Axcess Broad. Servs.,* 128 F.3d 872, 879 (5th Cir.1997); *IAE, Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir.1996); and *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.1990) [A nonexclusive license may be granted orally or arise from the conduct of the parties].

37.  The conduct of the parties giving rise to Plaintiffs' permanent nonexclusive licenses to Defendants' purported IP include, without limitation, these facts:

     a.   All the disputed IP items were commissioned and paid for by Plaintiffs.

b.   Many of them constituted or were emblazoned with "RDF" [Richard Dawkins Foundation] logos and the words "The Richard Dawkins Foundation For Reason and Science."

c.   All of them were offered for sale or given away for free through the website owned, operated and paid for by RDFRS (http://RichardDawkins.net).

d.   All of them were created solely and explicitly for Plaintiffs' benefit.

e.   Defendants authored and published internet representations that the IP being sold – as opposed to that which was being given away for free – was entirely to benefit RDFRS.

f.   Defendants delivered the IP to Plaintiffs to use, sell, distribute and/or give away.

g.   Defendants delivered thousands of dollars of merchandise incorporating the IP to Plaintiffs when RDFRS decided to operate The Store directly (in May 2010).

**The Nate Phelps "Fire + Brimstone" Documentary**

38.  Defendants Norton and Timonen approached Plaintiffs repeatedly in 2009 and early 2010 to seek funding for a full-length feature documentary they wanted to make about the experiences of a man named Nate Phelps. Defendants "pitched" their idea this way: "Nate Phelps, estranged son of 'God Hates Fags' Pastor Fred Phelps, travels to his hometown of Topeka, Kansas to tell his story of religious abuse, how he survived, and his mission to fix the laws that protect the perpetrators."  The working title of their film was "Fire + Brimstone" and they sought financing from RDFRS of $182,976 for its production.

39.  While Plaintiffs were still considering whether or not to finance or

invest in "Fire + Brimstone," in or about March and April 2010, Norton and Timonen advised Defendants that a crucial event was fast approaching in Topeka, Kansas involving Nate Phelps and that they desperately needed $15,000 for travel, venue and other expenses in order to capture film footage integral to their film (the "Brimstone Footage").

40.   RDFRS agreed to finance Defendants' $15,000 budget to obtain the Brimstone Footage, with the understanding that any decisions about financing or investing in the remainder of their budget for the film would be deferred.  RDFRS did provide Defendants with the $15,000 and Defendants did record the Brimstone Footage.

41.   Unfortunately, Defendants ran significantly over budget while shooting the Brimstone Footage and they attempted to get RDFRS to cover their cost overruns.  Defendant Norton also entered commitments to pay an additional $15,000 (approximately) to retain a law firm for production legal services and purchase an errors and omissions insurance policy, all without Plaintiffs' permission or authority.

42.   On June 6, 2010, Timonen sent an email to Richard Dawkins, Elisabeth Cornwell and RDFRS's Trustees acknowledging the obligation to refund RDFRS's "initial investment" in Fire + Brimstone.  Nonetheless, and despite Plaintiffs' demands for reimbursement, Defendants have failed to repay RDFRS for the costs of producing the Brimstone Footage.

**Defendants' Use Of Funds Embezzled From Plaintiffs**

43.   Plaintiffs are informed and believe and therefore allege that Defendants invested tens of thousands of dollars (and possibly more than $100,000) of the funds they embezzled from Plaintiffs on improvements to the residence Norton owns at 4532 Mary Ellen Avenue, Sherman Oaks, CA 91423, legally described as Parcel # 2360028027, Tract No. 10117, Lot 172 (the "Mary Ellen House").  A recent real estate listing for this property

describes some of the improvements Defendants paid for with funds embezzled from Plaintiffs as a "custom backyard pool and spa area with a wonderful waterfall and glass block fire pit plus custom seating for the ultimate outdoor living and entertaining experience."

## FIRST CAUSE OF ACTION

### (Breach of Oral Contract – by Richard Dawkins Against Timonen)

44.   Plaintiff Richard Dawkins re-alleges and incorporates all prior paragraphs of this Complaint.

45.   Defendant Timonen breached his oral contract with Richard Dawkins as alleged above.

46.   Professor Dawkins has performed each and every covenant, condition and obligation to be performed by him under the contract, except to the extent excused, waived or made impossible by Timonen's conduct.

47.   As a direct and proximate result of Timonen's breaches of the contract alleged above, Plaintiff Richard Dawkins has been and will be damaged in an amount not yet ascertained, but which he is informed and believes and therefore alleges equals at least $14,583.33, plus interest at the legal rate commencing on June 1, 2010.

## SECOND CAUSE OF ACTION

### (Breach of Oral Contract – by RDFRS Against All Defendants Except Norton)

48.   Plaintiff RDFRS re-alleges and incorporates all prior paragraphs of this Complaint except for paragraphs 38 through 42, inclusive.

49.   Defendants breached their substantially performed oral contract with RDFRS as alleged above.

50.   RDFRS has performed each and every covenant, condition and obli-gation to be performed by it under the contract, except to the extent

excused, waived or made impossible by Defendants' conduct.

51.   As a direct and proximate result of Defendants' breaches of the contract alleged above, Plaintiff RDFRS has been and will be damaged in an amount not yet ascertained, but which it is informed and believes and therefore alleges exceeds $375,000.

<strong>THIRD CAUSE OF ACTION</strong>

(Breach of Oral Contract – by RDFRS Against All Defendants)

52.   Plaintiff RDFRS re-alleges and incorporates all prior paragraphs of this Complaint except for paragraphs 21 through 37, inclusive.

53.   Defendants breached their substantially performed oral contract with RDFRS as alleged above.

54.   RDFRS has performed each and every covenant, condition and obligation to be performed by it under the contract, except to the extent excused, waived or made impossible by Defendants' conduct.

55.   As a direct and proximate result of Defendants' breaches of the contract alleged above, Plaintiff RDFRS has been and will be damaged in an amount not yet ascertained, but which it is informed and believes and therefore alleges exceeds $15,000.

<strong>FOURTH CAUSE OF ACTION</strong>

(Breach of the Implied Covenant of Good Faith And Fair Dealing –

by RDFRS Against All Defendants Except Norton)

56.   Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

57.   The oral contract between Plaintiffs and Defendants concerning Defendants' operation of The Store contained an implied covenant of good faith and fair dealing by and between the parties which prohibits them from engaging in any activity or conduct which would prevent the other party

from receiving the benefits of the contract.

58.  Plaintiffs have fully performed all covenants, conditions and obligations required by them to be performed by reason of the contract, except to the extent waived, excused or made impossible by Defendants' breach of the contract.

59.  Defendants, in acting or failing to act as alleged above, breached the implied covenant of good faith and fair dealing.  As a direct and proximate result of their breach of the implied covenant of good faith and fair dealing, Plaintiffs have been damaged in an amount not yet ascertained, but which Plaintiffs are informed and believe and therefore allege exceeds $375,000.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty – Against All Defendants)

60.  Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

61.  By agreeing, or voluntarily undertaking, to operate The Store for the beneficial interest of RDFRS, by marketing merchandise and intellectual property belonging to RDFRS, by continuously representing to the public (including all of The Store's customers) that The Store was being operated to benefit RDFRS, and by collecting and holding hundreds of thousands of dollars beneficially owned by RDFRS, Defendants owed RDFRS a fiduciary duty of loyalty and fidelity.  *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 221 ("[B]efore a person can be charged with a fiduciary obligation, he must . . . knowingly undertake to act on behalf and for the benefit of another. . . .").

62.  Defendants breached their fiduciary duty to Plaintiffs as alleged above.

63.  Plaintiffs have performed each and every covenant, condition and obligation to be performed by them under their agreements with Defendants, except to the extent excused, waived or made impossible by Defendants' conduct.  Plaintiffs' performance included the expenditure of hundreds of thousands of dollars and hundreds of hours of effort fulfilling their obligations to Defendants.

64.  As a direct and proximate result of Defendants' breach of fiduciary duty alleged above, Plaintiffs have been and will be damaged in an amount not yet ascertained, but which they are informed and believe and therefore allege exceeds $375,000.

## SIXTH CAUSE OF ACTION

### (Fraud – Against All Defendants)

65.  Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

66.  Plaintiffs are informed and believe and therefore allege that when Defendants agreed to operate The Store for the benefit of RDFRS, they harbored a secret intent to use Plaintiffs' resources and reputation to enrich themselves at RDFRS's expense by embezzling money contributed by people around the world who intended to benefit the US Foundation or the UK Foundation.  Defendants deceptively and dishonestly assured Plaintiffs they would abide by their agreements and representations and act as faithful and honest agents and fiduciaries, when they had no intention of doing so.

67.  The surreptitious actions and intentions alleged in paragraph 60, above, will be referred to herein as the "Fraudulent Concealments."

68.  The deceptive promises and representations alleged in paragraphs 23, 25, 27 and 28, above, will be referred to herein as the "Fraudulent Representations."

69.  The Fraudulent Concealments and Fraudulent Representations were material and were made by Defendants with the intention of inducing Plaintiffs to rely on them.  Plaintiffs reasonably and justifiably relied on the Fraudulent Concealments and Representations by allowing Defendants to operate The Store for approximately 3.5 years, retaining Timonen to provide services for Plaintiffs, allowing Defendants to utilize Plaintiffs' website to reach the approximately 1.5 million visitors it receives each month, allowing Defendants to utilize Plaintiffs' website to make what Plaintiffs now understand to have been false representations about the use of proceeds from sales at The Store, and paying Norton $10,000 for what they believed were uncompensated efforts for RDFRS.

70.  Plaintiffs were unaware of the falsity of the Fraudulent Concealments and Fraudulent Representations and did not know Defendants' true intentions.   Defendants knew that the Fraudulent Concealments and Fraudulent Representations were material and deceptive when they made their dishonest representations and concealed their continuing course of illegal conduct.

71.  As a direct and proximate result of Defendants' Fraud, Plaintiffs have been and will be damaged in an amount not yet ascertained, but which they are informed and believe and therefore allege exceeds $500,000.

72.  Plaintiffs are informed and believe and therefore allege that by perpetrating the Fraudulent Concealments and Representations set forth above, Defendants, and each of them, acted or failed to act in conscious disregard of Plaintiffs' rights with the intent to cause them cruel and unjust hardships.  Defendants, and each of them, acted in a despicable manner, intending to vex, injure and annoy Plaintiffs while enriching themselves, and have been guilty of oppression, fraud and malice, thus warranting an award of punitive damages, in an amount according to proof at trial.

**SEVENTH CAUSE OF ACTION**

(Embezzlement – Against All Defendants)

73.  Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

74.  California Penal Code § 503 provides that: "Embezzlement is the fraudulent appropriation of property by a person to whom it has been intrusted."  The word "person" in this statute is defined to include corporations and other fictitious legal entities as well as human beings.  The acts of Defendants alleged above violate this Penal Code section.

75.  California Penal Code § 504 provides that: "[E]very officer, director, trustee, clerk, servant, or agent of any . . . corporation (public or private), who fraudulently appropriates to any use or purpose not in the due and lawful execution of that person's trust, any property in his or her possession or under his or her control by virtue of that trust, or secretes it with a fraudulent intent to appropriate it to that use or purpose, is guilty of embezzlement."   The acts of Defendants alleged above violate this Penal Code section.

76.  California Penal Code § 506 provides that: "Every . . . person . . . intrusted with or having in his control property for the use of any other person, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of that person's trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, . . . is guilty of embezzlement."   The acts of Defendants alleged above violate this Penal Code section.

77.  California Penal Code § 507 provides that: "Every person intrusted with any property as bailee . . . , or with any power of attorney for the sale or transfer thereof, who fraudulently converts the same or the proceeds thereof to his own use, or secretes it or them with a fraudulent intent to his

own use, is guilty of embezzlement."   The acts of Defendants alleged above violate this Penal Code section.

78.  California Penal Code § 508 provides that: "Every clerk, agent, or servant of any person who fraudulently appropriates to his own use, or secretes with a fraudulent intent to appropriate to his own use, any property of another which has come into his control or care by virtue of his employment . . . , is guilty of embezzlement."   The acts of Defendants alleged above violate this Penal Code section.

79.  California Penal Code § 532(a) provides that: "Every person who knowingly and designedly, by any false or fraudulent representation or pretense, defrauds any other person of money, labor, or property, whether real or personal, . . . is punishable in the same manner and to the same extent as for larceny of the money or property so obtained."   The acts of Defendants alleged above violate this Penal Code section.

80.  As a direct and proximate result of Defendants' multiple violations of the California Penal Code, Plaintiffs have been and will be damaged in an amount not yet ascertained, but which they are informed and believe and therefore allege exceeds $500,000.

81.  Plaintiffs are informed and believe and therefore allege that by perpetrating the crimes set forth above, Defendants, and each of them, acted or failed to act in conscious disregard of Plaintiffs' rights with the intent to cause them cruel and unjust hardships.  Defendants, and each of them, acted in a despicable manner, intending to vex, injure and annoy Plaintiffs while enriching themselves, and have been guilty of oppression, fraud and malice, thus warranting an award of punitive damages, in an amount according to proof at trial.

///

///

## EIGHTH CAUSE OF ACTION

### (Interference With Prospective Economic

### Advantage – Against All Defendants)

82.  Plaintiffs re-allege and incorporate all prior paragraphs of this Complaint.

83.  Plaintiffs have an ongoing economic relationship with iDEA MEDIA Services ("iDEA MEDIA").  iDEA MEDIA has duplicated DVDs for Plaintiffs for distribution and sale in the past and Plaintiffs continue to look to iDEA MEDIA to duplicate DVDs for them in the future (because of their pricing and per-formance and because iDEA MEDIA is in possession of the digital masters of the DVD titles Plaintiffs currently sell to the public).  Plaintiffs also have ongoing and prospective economic relationships with the thousands of peo-ple who have previously purchased merchandise offered for sale through The Store on Plaintiffs' website (both before and after Defendants stopped operating The Store), the people who have in-process purchases of merchan-dise from The Store and the hundreds of thousands (if not millions) of people who will visit Plaintiffs' website (which incorporates The Store) in the near future.  These economic relationships have resulted in the sale of hundreds of thousands of dollars of products and merchandise through The Store in the recent past and have a strong probability of generating six-figure or greater annual profits for Plaintiffs in the future.

84.  Defendants are intimately aware of the economic relationships alleged in the immediately preceding paragraph.

85.  Defendants have intentionally acted to disrupt these economic relationships by purporting to prohibit iDEA MEDIA from duplicating DVDs for Plaintiffs.  On June 22, 2010, Norton sent an email to Tom Walsh of iDEA MEDIA regarding "Upper Branch titles" which said "The contract for these titles is with Upper Branch so you do need to be in the middle [between

Defendants and Plaintiffs – who had just reordered DVDs from iDEA MEDIA]
. . .  Until we get your account current we can't allow them to be repro-
duced. [¶]We are not authorizing any other companies other then [*sic*] Upper
Branch to place orders for these titles[.]"   On November 5, 2010, Timonen
repeated the interference in the form of another email to Tom Walsh and
"bookkeeping" at iDEA MEDIA.  Timonen's email had the following subject
line: "Formal instruction regarding Upper Branch Productions Inc. Intellec-
tual Property."  The body of the email said, in part: "Please consider this a
formal instruction from me as President of Upper Branch Productions, Inc. to
deny the Richard Dawkins Foundation access to any of the Upper Branch DVD
titles.  They do not have our permission to access our titles."

86.  Defendants' acts were intended to disrupt, and actually have
disrupted, Plaintiffs' current and prospective economic relationships with
iDEA MEDIA as well as with past, current and prospective customers.  In
addition, Defendants' emails to iDEA MEDIA constitute unlawful "slander of
title" (sometimes also referred to as "disparagement of title," "product
disparagement" or "business defamation") in that they falsely assert the
unfettered right to prohibit Plaintiffs from placing orders or having access to
"Upper Branch titles" even though the copyrights to two of those titles were
assigned to RDFRS on June 4, 2010 (as alleged in paragraph 35, above) and
RDFRS has implied nonexclusive copyright licenses to use all the other
"Upper Branch titles" (as alleged in paragraphs 36 and 37, above).

87.  As a direct and proximate result of Defendants' acts alleged above,
Plaintiffs have been and will be damaged in an amount not yet ascertained,
but which they are informed and believe and therefore allege exceeds
$500,000.

88.  Plaintiffs are informed and believe and therefore allege that by
perpetrating the acts set forth above, Defendants, and each of them, acted

or failed to act in conscious disregard of Plaintiffs' rights with the intent to cause them cruel and unjust hardships.  Defendants, and each of them, acted in a despicable manner, intending to vex, injure and annoy Plaintiffs while enriching themselves, and have been guilty of oppression, fraud and malice, thus warranting an award of punitive damages, in an amount according to proof at trial.

WHEREFORE, Plaintiffs pray for judgment as follows:

### ON ALL CAUSES OF ACTION

1.  For costs of suit; and

2.  For such other, further or different relief as the Court may deem proper.

### ON THE FIRST CAUSE OF ACTION

3.  For general and actual damages in excess of $14,583.33, plus interest at the legal rate commencing on June 1, 2010, according to proof.

### ON THE SECOND, FOURTH AND FIFTH CAUSES OF ACTION

4.  For general and actual damages in excess of $375,000, according to proof.

### ON THE THIRD CAUSE OF ACTION

5.  For general and actual damages in excess of $15,000, according to proof.

### ON THE SIXTH, SEVENTH AND EIGHTH CAUSES OF ACTION

6.  For general and actual damages in excess of $500,000, according to proof; and

7.  For exemplary damages, according to proof.


## JURY TRIAL DEMAND

Plaintiffs demand trial by jury on all issues so triable.


DATE: November 10, 2010          Respectfully submitted,


_Blaine Greenberg_
Blaine Greenberg, Esq.
Attorney for Plaintiffs
The Richard Dawkins Foundation for
Reason and Science and Richard Dawkins

**PROOF OF SERVICE - FEDERAL**

I, the undersigned, certify and declare that I am employed in the County of Los Angeles, State of California.  I am over the age of eighteen and not a party to the within action.  My business address is: 3400 Red Rose Drive, Encino, California 91436.

On November 11, 2010, I served a true copy of:

**PLAINTIFFS' FIRST AMENDED COMPLAINT**

by personally delivering it to the person indicated below in the manner provided in FRCivP 5(b); by depositing it in the United States Mail in a sealed envelope with the postage thereon fully prepaid addressed as follows:

Alan Abrams, Esq.
Charles Coate, Esq.
Costa Abrams & Coate LLP
1221 Second Street, Third Floor
Santa Monica, CA 90401

Place of Mailing: 3400 Red Rose Drive, Encino, CA 91436.

Executed on November 11, 2010, at Encino, California.

I hereby certify that I am a member of the Bar of the United States District Court, Central District of California.

Blaine Greenberg
(Print Name)

(Signature)